984 P.2d 967 (1999)
1999 UT 70
In the Matter of the ADOPTION OF B.B.D., a minor.
C.F., Appellant and Petitioner,
v.
D.D. and M.D., Appellees and Respondents.
No. 980053.
Supreme Court of Utah.
July 22, 1999.
*969 D. Bruce Oliver, Salt Lake City, for petitioner.
David M. McConkie, Merrill F. Nelson, Salt Lake City, for respondents.

On Certiorari to the Utah Court of Appeals
HOWE, Chief Justice:

INTRODUCTION
¶1 We granted certiorari to review an unpublished court of appeals opinion which affirmed the district court's decree of adoption.

BACKGROUND
¶2 In December 1995, K.D. and C.F., both residents of Washington State, began dating. Shortly thereafter, they began a sexual relationship, and in February 1996, K.D. learned that she was pregnant. She began regular visits with her physician and she and C.F. began discussing options regarding their unborn child's future. One option included placing the child for adoption with K.D.'s brother and sister-in-law, who resided in American Fork, Utah.
¶3 K.D. and C.F. ended their relationship in August 1996. About this same time, K.D. informed C.F. that she had consulted with lawyers in both Utah and Washington regarding placing their child for adoption. C.F. expressed his opposition to that proposal. On or about October 1, 1996, K.D. informed C.F. that she was flying to Utah to stay with her brother and sister-in-law, to give birth, and to place the child with them for adoption. On October 7, C.F. telephoned K.D. to express his opposition to the planned adoption. Later that day, C.F. went to the Division of Social and Health Services (DSHS) in Bellingham, Washington, in an attempt to establish paternity by registration. However, agents of DSHS informed C.F. that he could not establish paternity until after the child's birth.
¶4 K.D. arrived in Utah on or about October 10. Before giving birth, K.D. and C.F. had several telephone conversations regarding the child's future. In these conversations, K.D. continued to express her desire to place the baby for adoption; C.F. maintained his opposition.
¶5 On October 25, the child B.B.D. was born at the American Fork Hospital in American Fork, Utah. On October 28, in district court, K.D. signed her consent to the adoption, relinquished her parental rights, and placed the child with the adoptive parents. That same day, the adoptive parents filed their verified petition to adopt.
¶6 C.F. learned of the adoption proceedings on November 8, and on November 11, he went to the Domestic Relations Division in Washington to fill out a paternity questionnaire. Shortly thereafter, he received notice from the Division that it lacked jurisdiction over the child because the child was in Utah. C.F. did not file a paternity action in either Washington or Utah.
¶7 On November 26, C.F. filed a letter of opposition to the adoption proceeding with the district court, and on December 20, he filed an "Answer and Counterclaim" for custody of the child. The adoptive parents filed a motion to dismiss the answer and counterclaim under rule 12(b) which was treated as a motion for summary judgment under rule 56 of the Utah Rules of Civil Procedure. C.F. responded with his own motion for summary *970 judgment, including various other papers, memoranda, affidavits, and exhibits.
¶8 The district court ruled that because C.F. had failed to follow Utah's statutory scheme for establishing paternity, he had no legal standing to contest the child's adoption. On April 29, 1997, the court entered a final order and decree of adoption.
¶9 C.F. appealed and the Utah Court of Appeals, in an unpublished opinion, affirmed the district court's decree. It held that C.F. "failed to meet any of the requirements for notice or consent [to an adoption proceeding]," and because he failed to file "a paternity action or notice of paternity in Utah, [h]e is therefore statutorily precluded from maintaining any action to assert any interest in the child." We granted certiorari to review that decision.

ANALYSIS

I. CONSTITUTIONAL CLAIMS

A. Parental Rights
¶10 C.F. contends that his parental rights are protected by the constitution and cannot be terminated without a showing of unfitness. However, C.F. errs in that contention. While it is true that the relationship between parent and child is afforded some protection by the federal and state constitutions, see Wells v. Children's Aid Soc'y, 681 P.2d 199, 202 (Utah 1984), the rights of parents are commensurate with the responsibilities they have assumed, and in the case of unmarried fathers, a biological relationship alone is insufficient to establish constitutionally protected parental rights. See Lehr v. Robertson, 463 U.S. 248, 257-60, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
¶11 Under Utah law, "an unmarried biological father has an inchoate interest that acquires constitutional protection only when he demonstrates a timely and full commitment to the responsibilities of parenthood, both during pregnancy and upon the child's birth." Utah Code Ann. § 78-30-4.12(2)(e) (1996). An unmarried father demonstrates his commitment to the responsibilities of parenthood "by providing appropriate medical care and financial support, and by establishing legal paternity, in accordance with the requirements of [Utah law]." Id. (emphasis added). If an unmarried father fails to adhere to these requirements, including taking the necessary steps to establish paternity, "his biological parental interest may be lost entirely, or greatly diminished in constitutional significance by his failure to timely exercise it, or by his failure to strictly comply with the available legal steps to substantiate it." Id. § 78-30-4.12(3)(b) (emphasis added).
¶12 C.F. failed to take any of the legal steps necessary to protect his parental rights. Specifically, he failed to make any attempt to establish legal paternity under the provisions of Utah law. We conclude, therefore, that he has lost any parental right or interest to B.B.D.

B. Due Process
¶13 C.F. contends that section 78-30-4.13 denied him due process of law because he had no opportunity to object to his biological child's adoption proceeding. This contention lacks merit and has been thoroughly addressed in existing case law.
¶14 The state of Utah has a "compelling interest" in the adoption process. Utah Code Ann. § 78-30-4.12(2)(a) (1996). It has therefore enacted strict laws which are designed to provide "stable and permanent homes for adoptive children in a prompt manner" and to prevent "the disruption of adoptive placements." Id. The state is charged with the responsibility to see "that the rights and interests of all parties affected by an adoption proceeding [are] considered and balanced in determining what constitutional protections and processes are necessary and appropriate." Id. § 78-30-4.12(1) (1996).
¶15 The state has identified the rights of an unmarried mother. The unmarried mother, because she is
faced with the responsibility of making crucial decisions about the future of a newborn child, is entitled to privacy, and has the right to make timely and appropriate decisions regarding her future and the future of the child, and is entitled to assurance *971 regarding the permanence of an adoptive placement.
Id. § 78-30-4.12(2)(b). An unmarried father, on the other hand, "by virtue of the fact that he has engaged in a sexual relationship with a woman, is deemed to be on notice that a pregnancy and an adoption proceeding regarding that child may occur." Id. § 78-30-4.13(1). Because he is deemed to be on notice, it becomes his responsibility to protect his own rights of notice and consent according to the requirements of section 78-30-4.13 to -4.15. An unmarried father is "entitled to actual notice of a birth or adoption proceeding with regard to [his] child only as provided in [section 78-30-4.13]." This section states:
(2) Notice of an adoption proceeding shall be served on each of the following persons:
(a) any person or agency whose consent or relinquishment is required under Section 78-30-4.14 unless that right has been terminated by waiving relinquishment, consent, or judicial action;
(b) any person who has initiated a paternity proceeding and filed notice of that action with the state registrar of vital statistics within the Department of Health, in accordance with Subsection (3);
(c) any legally appointed custodian or guardian of the adoptee;
(d) the petitioner's spouse, if any, only if he has not joined in the petition;
(e) the adoptee's spouse, if any;
(f) any person who is recorded on the birth certificate as the child's father, with the knowledge and consent of the mother;
(g) any person who is openly living in the same household with the child at the time the consent is executed or relinquishment made, and who is holding himself out to be the child's father; and
(h) any person who is married to the child's mother at the time she executes her consent to the adoption or relinquishes the child for adoption.
Utah Code Ann. § 78-30-4.13(2)(a)-(h). Additionally, an unmarried father, "[i]n order to preserve any right to notice and consent, ... may initiate proceedings to establish paternity." Id. at § 78-30-4.13(3)(a).
¶16 To preserve his right of consent to or relinquishment for adoption, an unmarried father must have manifested his full commitment to parental responsibilities by:
(i) initiat[ing] proceedings to establish paternity ... and file with that court a sworn affidavit stating that he is fully able and willing to have full custody of the child, setting forth his plans for care of the child, and agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;
(ii) fil[ing] notice of the commencement of paternity proceedings with the state registrar of vital statistics within the Department of Health, in a confidential registry established by the department for that purpose; and
(iii) if he had actual knowledge of the pregnancy, paying a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his means, and when not prevented from doing so by the person or authorized agency have lawful custody of the child.
Id. § 78-30-4.14(2)(b). If an unmarried father fails to "fully and strictly comply" with the conditions stated above, he "is deemed to have waived and surrendered any right in relation to the child, including the right to notice of any judicial proceeding in connection with the adoption of the child, and his consent to the adoption is not required." Id. § 78-30-4.14(5).
¶17 C.F. failed to meet any of the requirements of notice and consent under section 78-30-4.13 and -4.14. He knew K.D. was pregnant, that she had moved to Utah to have the baby, and that she was going to place the baby for adoption. Nonetheless, he failed to take any action to establish paternity according to our statutory scheme; thus, he waived any right to notice and consent.
¶18 C.F. asserts that requiring him to comply with the requirements of section 78-30-4.13 violates his right to due process. We disagree. In Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the United States Supreme Court held that *972 the New York statutory scheme requiring unmarried fathers to file with a putative father registry before being entitled to rights to notice and consent to adoption proceedings did not violate due process. Similarly, in Swayne v. L.D.S. Social Services, 795 P.2d 637 (Utah 1990), we held that due process is not violated by requiring an unmarried father to file acknowledgment of paternity before he is entitled to rights of notice and consent. See also Wells, 681 P.2d 199; Beltran v. Allan, 926 P.2d 892 (Utah Ct.App. 1996); In re Adoption of W., 904 P.2d 1113 (Utah Ct.App.1995).

C. Equal Protection
¶19 C.F. next contends that section 78-30-4.13 is unconstitutional because it violates his right to equal protection under the law. He indirectly asserts that section 78-30-4.13 violates equal protection because it requires consent of the unmarried mother prior to an adoption proceeding but does not require the unmarried father's consent unless he has strictly followed the required steps necessary to establish paternity. Such a challenge lacks merit and has been thoroughly addressed in existing case law.
¶20 In Swayne we stated, "Utah's registration statute was designed to facilitate permanent and secure placement of illegitimate children whose unwed mothers wish to give them up for adoption and whose unwed fathers take no steps to officially identify themselves and acknowledge paternity." 795 P.2d at 641. While the mother of an illegitimate child is easily identified, paternity is more difficult to establish, and an informal acknowledgment of paternity is no guarantee that the father will not deny his paternity and legal liability for the child's care at some later date. Id. Therefore,
a reasonable basis for the different classification of unwed fathers and unwed mothers in section 78-30-4 is the fact that while identification of both parents of an illegitimate child is necessary, identification of a child's mother is automatic because of her role in the birth process, while identification of the father is not. A reasonable basis for the different classification of filing and nonfiling fathers is the state's need to distinguish those fathers who have accepted legal responsibility for the care of their children from those fathers who have not.
Id.
¶21 Based on this analysis and prior decisions, section 78-30-4.13 does not violate C.F.'s right to equal protection. See Lehr, 463 U.S. at 261-62, 103 S.Ct. at 2993-94, 77 L.Ed.2d 614 (holding that New York statutory scheme governing adoption did not violate unmarried father's right to equal protection by according different legal rights as between birth mother and putative father); Wells, 681 P.2d at 204; In re J.P., 648 P.2d 1364, 1375 n. 9 (Utah 1982); Ellis v. Social Servs., 615 P.2d 1250, 1255-56 (Utah 1980).

II. CONFLICT OF STATUTES
¶22 C.F. next argues that portions of the Adoption Act, Utah Code Ann. § 78-30-4.11 to -4.13, conflict with the Child Welfare Reform Act of 1994, Utah Code Ann. § 62A-4a-201, and the Voluntary Declaration of Paternity Act, Utah Code Ann. § 78-45e-2. We conclude that there is no conflict between these statutes.
¶23 Section 62A-4a-201 addresses the balance of rights between parents, children, and the state in cases where the safety of a child is at issue. It creates a presumption "that it is in the best interest and welfare of a child to be raised under the care and supervision of his natural parents" and that a child has a need for "a normal family life in a permanent home, and for positive nurturing family relationships" which are usually met by the child's natural parents. This section further provides that parents have a "natural, legal, and moral right, as well as duty, to care for their children" which has long been recognized by the "laws and Constitution of this state and the United States."
¶24 There is no conflict between section 62A-4a-201 and the Adoption Act. Section 62A-4a-201 applies to natural parents who have established full parental rights to their children. The Adoption Act, on the other *973 hand, addresses the steps which must be taken before an unmarried father can establish parental rights. See Utah Code Ann. § 78-30-4.12(2)(e). Rather than conflicting, the two sections are actually complimentary: once an unmarried father has taken the required steps to establish paternity and preserve his rights of notice and consent as required by the Adoption Act, he may become eligible for the parental rights afforded under section 62A-4a-201.
¶25 C.F. additionally argues that section 78-45e-2, concerning voluntary declaration of paternity, conflicts with the Adoption Act because the latter requires "affirmative measures of the father to be in place before the child's birth, but [the former] does not allow for a voluntary establishment prior to the child's birth." Again, there is no merit to this argument. Section 78-45e-2 presents an unmarried father with a window of time to voluntarily declare his paternity. It states, "[t]he voluntary declaration of paternity may be completed and signed any time after the birth of the child," but it "may not be executed or filed after consent to or relinquishment for adoption has been signed." Id. § 78-45e-2(3). However, while section 78-45e-2 does not allow a father to complete and sign his declaration of paternity until after the child's birth, section 78-30-4.13 does allow a father to initiate paternity proceedings to preserve his rights of notice and consent to an adoption proceeding prior to the child's birth.
¶26 We hold that there is no conflict between the challenged statutes. Had C.F. followed the established statutory scheme governing paternity and adoption, he could have initiated paternity proceedings prior to the child's birth under section 78-30-4.13(3)(a). This would have preserved his rights to notice and consent regarding the adoption proceeding of the child. He then could have formally established paternity under section 78-45e-2, which would have preserved his right to establish full parental rights, including the right to object to the adoption proceedings under section 78-30-4.14(2)(b). However, C.F. failed to comply with any of the foregoing requirements of the law, and he has therefore forfeited any parental rights to the child.

III. EVIDENTIARY HEARING
¶27 C.F. next contends that section 78-30-1.5 entitled him to an evidentiary hearing before the adoption was finalized. Section 78-30-1.5 states: "It is the intent and desire of the Legislature that in every adoption the best interest of the child should govern and be of foremost concern in the court's determination." C.F. asserts that this section entitles him to an evidentiary hearing to determine whether it is in the child's best interest to be raised by C.F. or the adoptive parents.
¶28 We have already held that by failing to establish his paternity, C.F. lost any parental rights he may have had. Therefore, he had no right to contest the adoption, nor did he have any right to an evidentiary hearing to determine whether the adoption was in the best interest of the child.

IV. JURISDICTION
¶29 Finally, C.F. contends that Utah has no jurisdiction over him, and thus he is not subject to Utah law. Specifically he asserts that he is a Washington State resident, has neither been to Utah nor conducted business here, and that Utah courts have never had subject matter or personal jurisdiction over him. C.F. errs in this assertion. He voluntarily invoked and submitted to the jurisdiction of Utah, its laws, and its court system when he intervened in the adoption proceeding. See Trent v. Trent, 735 P.2d 382 (Utah 1987); Rawlings v. Weiner, 752 P.2d 1327 (Utah Ct.App.1988); Kelly v. Draney, 754 P.2d 92 (Utah Ct.App.1988) (holding that Utah jurisdiction was proper over Washington State resident who commenced proceedings in Utah to enforce visitation and custody provisions of divorce decree); see also In re Marriage of Rizza, 237 Ill.App.3d 83, 177 Ill.Dec. 353, 603 N.E.2d 134, 139-40 (1992); Williams v. Williams, 555 N.E.2d 142, 145 (Ind.1990); Kilcullen v. Bubanj, 116 A.D.2d 470, 496 N.Y.S.2d 740, 742 (1986).
¶30 C.F. further argues that even if he is subject to Utah jurisdiction, he is a Washington *974 State resident and provisions of section 78-30-4.15(4) of the Utah Code should be applied in his case. This section provides as follows:
The Legislature finds that an unmarried biological father who resides in another state may not, in every circumstance, be reasonably presumed to know of, and strictly comply with, the requirements of this chapter. Therefore when all of the following requirements have been met, that unmarried biological father may contest an adoption, prior to the finalization of the decree of adoption, and assert his interest in the child; the court may then, in its discretion, proceed with an evidentiary hearing under Subsection 78-30-4.16(2):
(a) the unmarried biological father resides and has resided in another state where the unmarried mother was also located or resided;
(b) the mother left that state without notification or information to the unmarried biological father regarding where she could be contacted or located;
(c) the unmarried biological father has, through every reasonable means, attempted to locate the mother but has been unable to do so; and
(d) the unmarried biological father has complied with the most stringent and complete requirements of the state where the mother previously resided or was located, in order to protect and preserve his parental interest and right in the child in cases of adoption.
Utah Code Ann. § 78-30-4.15(4). C.F. directs our attention to subpart (d) and points out that Washington State does not require an unmarried father to commence a paternity action to fully establish his constitutional parental rights. However, even if this is true, C.F. has still failed to strictly meet all the other requirements as required by the statute.
¶31 For example, section 78-30-4.15(4)(b) requires that the mother leave her resident state without informing the father where she is going or how she can be located. See Ellis v. L.D.S. Soc. Servs., 615 P.2d 1250 (Utah 1980) (holding that unmarried father is entitled to show that he could not have reasonably expected his biological child to be born in Utah after biological mother left California immediately prior to child's birth without informing father where birth would occur). Despite the fact that C.F.'s brief states that the biological mother left Washington State without informing him where she was going or how to reach her, the record shows this simply is not true. In or around February 1996, after discovering that K.D. was pregnant, she and C.F. discussed the possibility of placing the unborn child for adoption with adoptive parents in American Fork, Utah. In or around August 1996, when K.D. and C.F. terminated their relationship, she informed him that she had consulted with lawyers in Utah regarding placing the child for adoption and was considering going to Utah to complete the pregnancy. On or about October 1, 1996, K.D. informed C.F. that she was traveling to Utah and would be living with the adoptive parents for the duration of the pregnancy. Finally, during October 1996, C.F. called K.D. many times after she had moved to Utah.
¶32 To meet the requirement of section 78-30-4.15(4)(c), a father must have made reasonable, but unsuccessful, efforts to locate the mother. Again, C.F. misstates the record by asserting that he was unable to locate K.D. for some time after the commencement of the adoption proceeding. As previously stated, after arriving in Utah on or about October 10, 1996, K.D. resided in American Fork, Utah, with the adoptive parents; she stayed with them until after the birth of the child. C.F. knew where she was staying and even called her while she was with the adoptive parents.
¶33 In light of the record, C.F. cannot meet the requirement of section 78-30-4.15(4). Thus, we hold that he is not entitled to any of the exceptions granted to out-of-state fathers under Utah law.

CONCLUSION
¶34 C.F. has failed to comply with the statutory scheme for establishing paternity in Utah, which would entitle him to notice and consent regarding the adoption proceedings of the child he fathered. Jurisdiction *975 was proper under Utah law, and by failing to comply with the provisions of the Adoption Act and the Voluntary Declaration of Paternity Act, C.F. waived his constitutional interest in the child and cannot now object to the final adoption decree. The judgment of the court of appeals is affirmed.
¶35 Justice STEWART and Justice RUSSON concur in Chief Justice HOWE's opinion.
¶36 Justice ZIMMERMAN concurs in the result.
¶37 Having disqualified herself, Associate Chief Justice DURHAM does not participate herein.